UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

R<span>EO</span> B<span>RYANT</span> et al.,

        Plaintiffs,         Case No. 2:20-cv-131

v.         Honorable Paul L. Maloney

C<span>ONNIE</span> H<span>ORTON</span> et al.,

        Defendants.
_____/

**OPINION**

        This is a civil rights action brought by 20 state prisoners under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. § 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiffs' complaint for failure to state a claim.

**Discussion**

**I.  Factual allegations**

        Plaintiffs presently are incarcerated with the Michigan Department of Corrections (MDOC) at the Chippewa Correctional Facility (URF) in Kincheloe, Chippewa County, Michigan. The events about which they complain occurred at that facility. Plaintiffs sue MDOC Director

Heidi Washington, URF Warden Connie Horton, and unknown custody, civilian, and food service staff named as "John Does 1-99" (Unknown Part(y)(ies)).

Plaintiffs allege that Defendants failed to take important measures to control the spread of COVID-19 and protect inmates at URF.  None of the allegations recited in the complaint occurred after April 14, 2020.  As of that date or before, Defendants allegedly permitted staff to arrive at the prison without valid personal protective equipment (PPEs), such as masks, and staff members took off their PPEs in the mess hall and while they were in close proximity to prisoners.  Staff also discouraged prisoners from wearing gloves.  Further, staff allegedly crowded into the officer space during mass movement, breaking social-distancing rules.  Defendants did not provide prisoners with bleach to clean the unit on at least one occasion.  In addition, officers performed pat-down searches without wearing gloves or used the same gloves on multiple prisoners.  Defendants did not maintain social distancing between staff and prisoners, and prisoners were required to gather in groups of up to 50 to 75 men at various points.  Essential prisoner workers, such as kitchen and janitorial staff, were required to work in close proximity to one another and staff, and they have not been provided extra "life preserving gear or extra pay." (Compl., ECF No. 1, PageID.12.)  Finally, despite the fact that some number of prisoners at URF have underlying health conditions and suffered vague symptoms, those prisoners were denied a COVID-19 diagnostic test.  Plaintiffs contend that Defendants' conduct has violated their rights under the Eighth Amendment.

Plaintiffs request class certification (ECF No. 3), stating that the conditions at URF place all prisoners at risk of contracting COVID-19, creating a substantial risk of serious injury or death, particularly among those who have underlying health conditions.  Plaintiffs also request preliminary injunctive relief (ECF No. 2) in the form of an order prohibiting the placement of more

than one prisoner in each cell and an order requiring the reopening of the Kinross Correctional Facility.

In addition to their request for preliminary injunctive relief, Plaintiffs seek compensatory and punitive damages.

## II.   Class Certification

Plaintiffs request class certification (ECF No. 3). For a case to proceed as a class action, the court must be satisfied on a number of grounds, including the adequacy of class representation. *See* Fed. R. Civ. P. 23(a)(4). It is well established that *pro se* litigants are inappropriate representatives of the interests of others. *See Garrison v. Mich. Dep't of Corr.*, 333 F. App'x 914, 919 (6th Cir. 2009) (citing *Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975)); *see also Dodson v. Wilkinson*, 304 F. App'x 434, 438 (6th Cir. 2008); *Ziegler v. Michigan*, 59 F. App'x 622, 624 (6th Cir. 2003); *Palasty v. Hawk*, 15 F. App'x 197, 200 (6th Cir. 2001); *Howard v. Dougan*, No. 99-2232, 2000 WL 876770, at *1 (6th Cir. June 23, 2000). Because Plaintiffs are incarcerated *pro se* litigants, the Court finds that they are not appropriate representatives of a class. Therefore, the Court will deny Plaintiffs' request for class certification.

## III.   Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim

3

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

**IV.    Eighth Amendment**

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial

4

of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)). The deliberate-indifference standard includes both objective and subjective components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35-37. To satisfy the objective prong, an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Under the subjective prong, an official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* at 836. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

5

In *Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020), the Sixth Circuit squarely held that the significant risk posed by COVID-19 met the objective prong of the deliberate-indifference standard. *Id.* at 840. In addition, in evaluating the subjective component, the *Wilson* court concluded that, because the seriousness of the risk of COVID-19 was obvious, the court could permissibly conclude that Defendants were aware of the risk. *Id.* at 841 (citing *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)). Therefore, as in *Wilson*, the remaining inquiry before this Court is whether Defendants, by their actions, "responded reasonably to the risk." *Id.* at 841 (quoting *Farmer*, 511 U.S. at 844).

In *Wilson*, the court considered the actions taken by the BOP to mitigate the risk of COVID-19 contagion, including the following:

> implement[ing] measures to screen inmates for the virus; isolat[ing] and quarantin[ing] inmates who may have contracted the virus; limit[ing] inmates' movement from their residential areas and otherwise limit[ing] group gatherings; conduct[ing] testing in accordance with CDC guidance; limit[ing] staff and visitors and subject[ing] them to enhanced screening; clean[ing] common areas and giv[ing] inmates disinfectant to clean their cells; provid[ing] inmates continuous access to sinks, water, and soap; educat[ing] staff and inmates about ways to avoid contracting and transmitting the virus; and provid[ing] masks to inmates and various other personal protective equipment to staff.

*Id.* (quoting CA6 R. 35, Appellant Br., PageID 42). The Sixth Circuit noted that other Sixth Circuit decisions had found similar responses to contagious diseases by prison officials and medical personnel—such as cleaning cells, quarantining infected inmates, and distributing information about a disease in an effort to prevent spread—to be reasonable. *Id.* at 841 (*citing Wooler v. Hickman Cty.*, 377 F. App'x 502, 506 (6th Cir. 2010); *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 448-49 (6th Cir. 2014); *Harrison v. Ash*, 539 F.3d 510, 519-20 (6th Cir. 2008); *Rhinehart v. Scutt*, 894 F.3d 721, 740 (6th Cir. 2018). Further, the *Wilson* court observed that other circuits had concluded that similar actions by prison officials demonstrated a reasonable response to the risk

6

posed by COVID-19. *Id.* at 842 (discussing *Swain v. Junior*, 958 F.3d 1081, 1085 (11th Cir. 2020), *Valentine v. Collier,* 956 F.3d 797 (5th Cir. 2020) (per curiam), and *Marlowe v. LeBlanc*, No. 20-30276, 2020 WL 2043425 (5th Cir. Apr. 27, 2020) (per curiam).

Reviewing the measures taken by the BOP, the *Wilson* Court held that, even if the BOP's response to COVID-19 was inadequate to prevent all contagion, the affirmative actions it took to not only treat and quarantine inmates who had tested positive, but also to prevent widespread transmission of COVID-19, constituted a reasonable response to the risk. The court therefore held that, because the BOP neither disregarded a known risk nor failed to take steps to address the risk, it did not act with deliberate indifference in violation of the Eighth Amendment. *Id.* at 843.

In the instant case, Plaintiffs claim that Defendants' handling of the COVID-19 crisis violated their Eighth Amendment rights while they were housed at URF, at least as of April 14, 2020, the date of the last factual allegation contained in the complaint. In those early days of the pandemic's spread in Michigan, not all of the safety measures now in place had been implemented. Nevertheless, the MDOC issued its first COVID-19 Director's Office Memorandum (DOM) on April 8, 2020, and issued revised DOMs on the subject on May 26, 2020, *see* MDOC DOM 2020-30R2 (eff. May 26, 2020) (outlining specific precautions to be taken by staff members, including the use of personal protective equipment and hand sanitizer), May 27, 2020, *see* MDOC DOM 2020-30R3 (eff. May 27, 2020) (same), and August 10, 2020, *see* MDOC DOM 2020-30R4. The Court also notes that, as of the date that this opinion is being written, there have been no confirmed cases of a prisoner with COVID-19 at URF. (*See* https://medium.com/@MichiganDOC/mdoc-takes-steps-to-prevent-spread-of-coronavirus-covid-19-250f43144337.) In addition, as of May 22, 2020, the MDOC completed the testing of every

prisoner in the 29-prison system in less than 15 days.  *See* MDOC Press Release, https://www.michigan.gov/corrections/0,4551,7-119-1441_26969-529997--,00.html (last visited May 26, 2020).

Moreover, the Court notes that the MDOC has taken significant measures to limit the threat posed by COVID-19, many of which were implemented just before or shortly after the incidents described in the complaint.  These measures include:

**Personal Protective Equipment, cleaning and mitigation measures**
- Michigan State Industries has produced masks for all prisoners and correctional facility staff to wear.  Each employee and prisoner received three masks each and the masks can be laundered and worn again.  Facility staff are also permitted to bring their own PPE, such as masks, gloves and gowns.  Staff are expected to wear their mask during their entire shift and prisoners are expected to also wear their masks at all times, except while eating, sleeping or showering. Michigan State Industries is also manufacturing gowns, protective eyewear and protective suits.
- All MDOC staff transporting a prisoner on or off grounds are required to be dressed in full personal protective equipment (PPE), which is available for those employees.
- All facilities have received approval from the regional sanitation officer to use bleach during facility cleaning.  Facilities have enhanced cleaning efforts and cleaning products are available to clean commonly-used areas and phones before and after use.  Cleaning efforts have been doubled at facilities with vulnerable prisoner populations.  We have increased our production of soap and ensured that all prisoner areas and bathrooms have plentiful access to soap.  Soap has been distributed to prisoners and prisoners have been told that if they need more soap they only need to ask.  Additional soap will be provided at no charge.  CDC posters detailing proper hygiene practices have been posted in correctional facilities and have also been recreated digitally so they play on TV screens throughout our facilities.  These are the same posters you will see in your community and throughout State of Michigan office buildings.
- Movements have been modified to help facilitate social distancing and the number of prisoners attending classes and meals has been reduced so prisoners can be seated farther apart.  Prisoners and staff are frequently reminded of the need for social distancing and prisoners are instructed not to gather in groups on the yard.  Activities such as basketball and weight pit have been suspended to encourage social distancing, as well.  There are also markers and cones set up for med lines and in the chow hall as a visual reference for prisoners on how far apart they should stand.
- The department has been leading the nation when it comes to consistent testing of the prisoner population when they have symptoms.  Following the completion Friday, May 22, of testing prisoners at Michigan Reformatory in Ionia for COVID-

19, the Michigan Department of Corrections has completed its goal of testing every prisoner in its system.

**Visits and Transfers**
- Visitation at facilities statewide was suspended as of March 13.
- The department worked with communication vendors GTL and JPay to provide enhanced services for prisoners to communicate with family and friends during the period without visits. JPay is continuing to offer two free stamps per week and a 10% discount on stamps through June 30, 2020. GTL's internet and mobile fees are reduced with the regular $2.95 transaction fee reduced to $1.95 and the $1.95 transaction fee reduced to $0.95. JPay had also offered two free stamps per week through June 2, 2020. GTL provided one free, five-minute phone call every seven days for the first two weeks of May 2020 and, for the entire month of May, GTL reinstated the internet and mobile fees with reduced rates. We will continue to work with the companies on anything else they may be willing to provide.
- In connection with visitation suspension, face-to-face college classes at all facilities have also been suspended effective immediately. The MDOC will work with higher education institutions willing and able to deliver classes as correspondence courses. Core programming and school classes taught by MDOC staff will continue.
- Outside contractors for substance abuse programming will be allowed inside and will be screened upon entry per the screening protocol. Attorney visits will continue to be authorized.
- During this time, transfers of prisoners or staff between facilities will not be authorized without the approval of the Assistant Deputy Director or higher.
- The department issued protocol to all county sheriff offices to offer guidance on screening and other preventative measures.

**Quarantine and Care of Sick Prisoners**
- Facility healthcare staff will meet with prisoners who have presented with symptoms of coronavirus. The MDOC does not make the diagnosis of the coronavirus. The department is following the Michigan Department of Health and Human Services protocol. If a prisoner has symptoms and meets the criteria for testing, the MDOC can test the prisoner.
- Prisoners who test positive for the virus are isolated from the general population and any prisoners or staff they have had close contact with are identified and notified of the need to quarantine.
- Prisoners who test positive will be transferred to one of the department's designated quarantine units at either G. Robert Cotton Correctional Facility, Carson City Correctional Facility or the former Maxey Annex, which is located near Woodland Center Correctional Facility. The Maxey Annex previously housed juvenile offenders under the jurisdiction of MDHHS, prior to its closure, and the MDOC had been working to convert it to a training site. These units are in buildings that are completely separated from each of the correctional facilities. They have limited movement and access to these units is extremely limited. Only a small number of designated staff work in the unit in 12-hour shifts to limit the number of people

- entering. Those staff members report directly to the unit and do not enter the main correctional facility. Prisoners transferred to the unit also stay on the unit and do not enter any other areas of the prison.
- Prisoners who have been identified as having close contact with another prisoner who tests positive, but have not tested positive for the virus themselves, will be isolated from the general population at their facility for the 14-day quarantine period.
- Co-pays for prisoners who need to be tested for COVID-19 have been waived.
- Prisoners have been urged to notify healthcare if they are sick or experiencing symptoms of illness so they can be evaluated. Prisoners who require outside medical attention will be transported to an area hospital for treatment.

**Recovery**
- Prisoners are considered in step-down status when they no longer have symptoms, are no longer considered contagious and have been medically cleared by our chief medical officer.
- A unit has also been established at Central Michigan Correctional Facility for recovered prisoners who previously tested positive for the virus. These prisoners are considered officially recovered by the Michigan Department of Health and Human Services, have no symptoms, are not considered contagious, have been medically cleared by the MDOC's chief medical officer, and must test negative before they are moved to the unit at Central. Not all of the prisoners coming to Central's unit will come from Gus Harrison Correctional Facility's step-down unit. With the number of prisoners who are placed at the COVID positive units at Macomb Correctional Facility, G. Robert Cotton Correctional Facility and Carson City Correctional Facility, not all will move to Gus Harrison Correctional Facility, given there are only 120 beds in the facility's step-down unit. It is possible prisoners will come from other locations, but ONLY if they have since tested negative, and it has been 30 days at least since the onset of their symptoms. The department is NOT sending COVID-19 positive prisoners to Central.

**Parole Information**
- The MDOC Parole Board continues to hold parole hearings and is reviewing all eligible cases to determine prisoners who can be safely released at this time. In addition, the department will begin holding remote public Parole Board hearings for parolable life sentence and clemency cases. You can find more information on scheduled hearings and how to participate here.
- The department continues to review individual cases and the Parole Release Unit is working to process parole releases for prisoners with positive parole decisions as quickly and safely as possible.
- We are no longer allowing parole representatives to enter correctional facilities for parole hearings as an additional step to limit the potential introduction of illness. However, individuals designated by a prisoner as a parole representatives should contact the facility where the prisoner is being housed to find out about options to call in for the hearing.

- The Parole Board is aware that prisoners do not have access to certain programming and the Board is taking that into consideration. If there are changes in the prisoner's case, the prisoner will be notified directly.
- We continue to monitor the prisoner population, our parole and probation population and the parole process as this pandemic continues, in order to consider all options to ensure the safety of offenders under our supervision.
- All of our paroles are done with public safety in mind. The Parole Board looks at each individual on a case-by-case basis and will only grant a parole if they believe that person will not be a harm to society.
- All prisoners set to parole must take a COVID-19 test before being released. The MDOC is working to expedite the parole release of those individuals who can safely and legally be released at this time. There are a number of steps that are included in the parole release process, which now includes testing for COVID-19 to ensure the individual will not pose a risk to loved ones or the community upon release. As a result, a limited number of parole dates may be changed to accommodate these processes. If a prisoner tests positive they will not parole until they are cleared by healthcare, which is at least 14 days from the onset of symptoms. Prisoners who test negative will be paroled as scheduled.

(*Id.*)

Plaintiffs do not allege that they have come into contact with any individual who has COVID-19, and, as previously stated, no COVID-19 cases have been reported at URF since the onset of the pandemic. The MDOC has taken extensive steps to address the risk of COVID-19 to inmates statewide. As the Sixth Circuit observed in *Wilson*, such actions demonstrate the opposite of a disregard of a serious health risk. *Wilson*, 961 F.3d at 841. Although the Court is sympathetic to Plaintiffs' general concerns about the COVID-19 virus, they have failed to allege facts showing that Defendants' handling of the COVID-19 crisis violated their Eighth Amendment rights.

**V.    Motion for Preliminary Injunction**

Plaintiffs ask the Court to order preliminary injunctive relief to limit cell occupancy and reopen a prison. Because the complaint is properly dismissed for failure to state a claim, the Court will deny Plaintiffs' motion (ECF No. 2) as moot.

**Conclusion**

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiffs' complaint will be dismissed for failure to state a claim, under 28 U.S.C. § 1915A(b), and 42 U.S.C. § 1997e(c).  The Court also will deny Plaintiffs' motions for class certification and preliminary injunctive relief.

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3).  *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997).  Although the Court concludes that Plaintiffs' claims are properly dismissed, the Court does not conclude that any issue Plaintiffs might raise on appeal would be frivolous.  *Coppedge v. United States*, 369 U.S. 438, 445 (1962).  Accordingly, the Court does not certify that an appeal would not be taken in good faith.  Should Plaintiffs appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiffs are barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g).  If they are barred, they will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A judgment consistent with this opinion will be entered.

Dated:   September 1, 2020                           /s/ Paul L. Maloney
                                                     Paul L. Maloney
                                                     United States District Judge